**ATLANTIC RICHFIELD COMPANY,**
et al., **Plaintiffs,**

v.

**Joseph M. BLOSENSKI, Jr.,**
et al., **Defendants,**

v.

**ATLANTIC RICHFIELD COMPANY,**
et al., **third-party Defendants.**

**UNITED STATES of America, Plaintiff,**

and

**Commonwealth of Pennsylvania, Department of Environmental Resources,**
**Plaintiff-Intervenor,**

v.

**Joseph M. BLOSENSKI, Jr.,**
et al., **Defendants.**

**Civ. A. Nos. 92–2059, 93–1976.**

United States District Court,
E.D. Pennsylvania.

March 7, 1994.

---

James J. Rohn, Karen M. Scheller, Conrad, O'Brien, Gellman & Rohn, P.C., Carl B. Everett, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Atlantic Richfield Co., Inc., Valspar Corp.

James J. Rohn, Karen M. Scheller, Conrad, O'Brien, Gellman & Rohn, P.C., Jennifer L. Berke, The Budd Co., Philadelphia, PA, Richard O. Lemke, The Budd Co., Troy, MI, for Budd Co.

James A. Cunningham, Gilbertsville, PA, for Joseph M. Blosenski, Jr., Joseph M. Blosenski Trash Removal, Blosenski Disposal Co., Inc., Blosenski Disposal Co., Inc., Blosenski Disposal Corp., Blosenski Disposal Service, Blosenski Trucking Co., Blosenski Trucking Corp., Blosenski Trucking Corp., of Pennsylvania, Blosenski Transfer & Recycling Co., Blosenski Transfer & Recycling Station, Richard L. Blosenski, Joseph M. Blosenski, III, Anthony Blosenski, Cupola Trucking Corp.

Patrick C. O'Donnell, O'Donnell & Wright, West Chester, PA, for Alexander M. Barry.

Terry R. Bossert, Bernard A. Labuskes, Jr., Scott A. Gould, McNees, Wallace & Nurick, Harrisburg, PA, for Eastern Waste Industries, Inc.

William P. Mahon, West Chester, PA, James A. Cunningham, Gilbertsville, PA, for Cupola Indus. Centre, Inc.

Tom P. Monteverde, Lawrence R. Woehrle, John M. Myers, Monteverde & Hemphill, Philadelphia, PA, for Delaware Container Co., Inc.

Lawrence R. Woehrle, John M. Myers, Monteverde & Hemphill, Philadelphia, PA, for James A. Ries, Gerald M. Ries.

Lawrence Sager, pro se.

Nancy Conrad, Amy E. Wilkinson, Duane, Morris & Heckscher, Philadelphia, PA, for C & D Charter Power Systems, Inc.

Michael A. Bogdonoff, Dechert, Price & Rhoads, Philadelphia, PA, for Chubb Nat. Foam, Inc.

Jay D. Branderbit, Marks, Kent & O'Neill, P.C., Philadelphia, PA, for Esschem, Inc.

Christopher R. Gibson, Archer & Greiner, Haddonfield, NJ, for Finnaren & Haley, Inc., Morton Intern., Inc.

William M. Bumpers, Steven L. Leifer, Howrey & Simon, Washington, DC, Edward M. Dunham, Jr., Miller, Dunham, Doering & Munson, Philadelphia, PA, for Childers Products Co., Inc.

Joshua M. Levin, Environmental & Natural Resources Div. U.S. Dept. of Justice, Environmental Defense Section, Washington, DC, for United States (Philadelphia Naval Shipyard).

Walter J. Stickley, Jr., Philadelphia, PA, for Rohm & Haas Co.

Michael R. Dillon, Denis Brenan, Dierdre M. Mullen, Morgan, Lewis & Bockius, Philadelphia, PA, for ICI Americas, Inc.

Michael J. Rotko, Brian Carroll, U.S. Attorney's Office, James G. Sheehan, Asst. U.S. Atty., Civil Div., Philadelphia, PA, Joshua M. Levin, Environmental & Natural Resources Div., U.S. Dept. of Justice, Environmental Defense Section, Myles E. Flint, Asst. Atty. Gen., Environment & Natural Resources, David L. Dain, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for U.S.

Leigh B. Cohen, PA Dept. of Environmental Resources, Conshohocken, PA, Beth A.M. Termini, U.S. Environmental Protection

Agency, Philadelphia, PA, for Pennsylvania Dept. of Environmental Resources.

Carl B. Everett, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Monsanto Corp.

Daniel Jonas, Miller, Alfano & Raspanti, P.C., Philadelphia, PA, Michael M. Gordon, Charles R. Virginia, Cadwalader, Wickersham and Taft, New York City, for Occidental Chemical Corp.

Dennis Michael Abraham, Leigh B. Cohen, Commonwealth of PA., Dept. of Environmental Resources, Conshohocken, PA, for Commonwealth of Pennsylvania.

William P. Mahon, West Chester, PA, for Ada Blosenski.

## MEMORANDUM

GILES, District Judge.

The above captioned actions, which have been consolidated for trial, are brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., to determine and allocate responsibility for the clean-up of hazardous wastes from a landfill in Chester County, Pennsylvania. The trial has been trifurcated, with Phase I concerned solely with the liability of certain defendants for response costs associated with the clean-up. See Order of October 29, 1993.[1]

Plaintiffs in both actions have moved for summary judgment against certain defendants as to Phase I liability. In *United States, et al. v. Blosenski, et al.*, Civil Action No. 93–1976 ("the *U.S.* action"), The United States and the Commonwealth move for summary judgment as to Phase I liability against Alexander M. Barry ("Barry"), Joseph M. Blosenski, Jr. ("Blosenski"), Blosenski Liquidating Company, a/k/a Blosenski Disposal Company, Inc. ("BDC"), B.T. Liquidating Corp., a/k/a Blosenski Trucking Corporation ("BTC"), and Eastern Waste Industries, Inc.

("EWI"). In *Atlantic Richfield, et al. v. Blosenski, et al.*, Civil Action No. 92–2059, ("the *ARCO* action"), plaintiffs also move for summary judgment against the above-named defendants, all of whom are also defendants in the *ARCO* action. In addition, they seek summary judgment against Ada Blosenski and Suburban Sanitation Corporation ("SSC").[2] Finally, some of the defendants have crossmoved for summary judgment. For the reasons stated below, plaintiffs' motions for summary judgment will be granted as to defendants Blosenski, BDC, BTC, and EWI. The motions will be denied as to defendants Barry, Ada Blosenski, and SSC. Defendants' cross-motions will be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment will be entered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the moving party which must "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the moving party makes such a showing, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The nonmoving party must satisfy this burden through the introduction of testimony "as would be admissible in evidence," *id.*, such as an affidavit or deposition testimony. Fed.R.Civ.P. 56(c). If, however, the moving party ultimately persuades the court that there are no genuine issues of material fact, then the court must decide whether the law dictates an outcome in favor

---

1. A number of issues remain for resolution beyond Phase I, including the liability of the remaining defendants, the amount of response costs the United States is entitled to recover, the potential liability of several defendants for penalties under 42 U.S.C. § 9606, and the allocation of costs between all liable parties.

2. Ada Blosenski is not named as a defendant in the *U.S.* action. While Suburban Sanitation Corporation is named as a defendant in the *U.S.* action, the United States and the Commonwealth have not moved for summary judgment against it. *See* Memorandum of the United States in Support of its Motion for Summary Judgment (docketed at # 120 in the *U.S.* action) at 29 n. 12.

of the moving party. If so, the motion for summary judgment must be granted.[3]

## II. CERCLA

In response to growing concern about the dangers posed by hazardous waste sites, Congress enacted CERCLA. CERCLA is intended "to force polluters to pay for costs associated with remedying their pollution." *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259–60 (3d Cir.1992). CERCLA grants the President of the United States broad authority to provide for the cleanup of sites contaminated by hazardous substances. Most of this authority has been delegated to EPA. *See Alcan*, 964 F.2d at 258. CERCLA is a remedial statute that should be construed liberally to effectuate its goals. *Alcan*, 964 F.2d at 258.

CERCLA authorizes the United States to use "Superfund" monies to clean up a site, and then recover those response costs from the parties responsible for the pollution. *See* 42 U.S.C. § 9607, 9611–12. Parties other than the United States who have incurred clean-up response costs can also recover those costs under CERCLA. Plaintiffs in each of these consolidated actions seek to recover response costs from defendants.

## III. UNDISPUTED FACTUAL BACK-GROUND

Blosenski began his waste hauling business with a single trash collection route in the late 1960s. Over the next few years, his trash collection and hauling business, which he operated as a sole proprietorship, gradually expanded. *See* Jt. Exh. B at 52–54, 60–61 (Blosenski deposition). In 1971 he purchased an eight-acre dump in Chester County, Pennsylvania. *See* Blosenski's Memorandum of Law Contra to ARCO and U.S. Summary Judgment Motions (docketed at # 238 in the *ARCO* action, hereinafter referred to as "Blosenski Mem.") at 2 (admitting owner-

ship); Jt. Exhibits 37, 38, 39 (deeds). Shortly after he purchased the eight-acre property, he began to use it in conjunction with his waste hauling business, hauling waste to the property for disposal, and allowing others to dispose waste there. *See* Blosenski Mem. at 2 (admitting that between 1971 and May 3, 1979 Blosenski "transported certain substances" to the Site); Jt. Exh. B at 54 (Blosenski deposition); Jt. Exh. C at 24–25 (same); Jt. Exh. D at 140 (same). In 1972, Blosenski purchased approximately five acres of land adjacent to the eight-acre tract. *See* Jt. Exh. 39 (deed).[4] The EPA has identified these combined tracts as a "Superfund" site ("the Site"). *See* Jt. Exh. 50 at ¶ III.A.1 (EPA Administrative Order for Remedial Action, Phase II). Blosenski owned and operated the Site as a landfill, and continued to transport waste to the Site until at least May 3, 1979. *See* Blosenski Mem. at 2 (admitting that between 1971 and May 3, 1979 Blosenski "transported certain substances" to the Site).

Shortly after he began using the Site, Blosenski was cited by the Pennsylvania Department of Environmental Resources ("PaDER") for operating a permitless landfill. *See* Jt. Exh. 46. In early 1972, he signed a consent decree with PaDER, requiring him to make certain improvements at the Site to prevent leachate from wastes dumped there from migrating to neighboring properties. *See* Jt. Exh. 46; Jt. Exh. 106 (1972 Consent Decree in *Commonwealth v. Blosenski*, C.A. 2404). Blosenski continued to operate the site throughout the 1970s. During that time he was repeatedly cited by PaDER for violations, found in contempt, and fined. *See generally* Jt. Exh. 46.

By 1982, EPA was actively investigating the Site, which was placed on the National Priorities List ("NPL"), *see* 42 U.S.C. § 9605, in September of 1983. *See* Jt. Exh. 50; Jt. Exh. 65 at 19 (Techlaw Report). When the Site was placed on the NPL, EPA began a Remedial Investigation/Feasibility Study

---

**3.** Contrary to the argument of defendant Blosenski, summary judgment "is no longer a disfavored procedural shortcut." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992). Instead, it is an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inex-

pensive determination of every action." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2555.

**4.** Defendant Barry's name also appears on the deed to the five-acre parcel. However, there is a factual dispute as to whether Barry was an owner of the property. *See infra* Section IV(B)(3)(b).

("RI/FS"), pursuant 42 U.S.C. § 9604, which was completed in February 1986. The study reported numerous hazardous substances in Site soils, sediments and ground water. *See* U.S. Exh. 1, Table 7–1 at pages 7–7 through 7–15. In September of 1986, EPA issued its Record of Decision selecting a four-phase remedial plan for the Site. *See* Jt. Exh. 49.

In 1985, while EPA was actively investigating the Site, Blosenski attempted to restructure his business, which had previously been run as a sole proprietorship. In 1985, the Blosenski waste hauling business was incorporated into three corporations: Blosenski Disposal Co., Inc. ("BDC"); Blosenski Trucking Corporation ("BTC"); and Suburban Sanitation Corp. ("SSC") (collectively, "the Blosenski Corporations"). U.S. Exh. 9 (certificates from Secretary of Commonwealth); Jt. Exh. B at 85–86, 109 (Blosenski deposition).

In 1986, representatives of Eastern Waste Industries, Inc. ("EWI") began to discuss with Blosenski the possibility of purchasing the Blosenski Corporations' assets. EWI Exh. G (Speake deposition); EWI Exh. H (Vorel deposition). An asset purchase agreement was entered into on January 1, 1987 between EWI and the Blosenski Corporations and their shareholders. EWI purchased the assets for over $4.5 million. Jt. Exh. 11. There was no purchase of stock and EWI did not issue shares of its stock to the Blosenski Corporations or any of their shareholders as part of the asset purchase. EWI Exh. K at ¶ 11 (Sinclair Affidavit).

## IV. DISCUSSION

In order to recover their response costs, plaintiffs must show that for each defendant against whom they seek recovery:

1) the defendant falls into one of [the] categories of "covered persons," 42 U.S.C. §§ 9607(a)(1)–(4); 2) there has been a release or a threatened release of a hazardous substance from a facility, 42 U.S.C. § 9607(a)(4); 3) this release or threatened release has caused the plaintiff to incur response costs; 4) the plaintiff's response costs are necessary and consistent with the [National Contingency Plan ("NCP"), *see*

42 U.S.C. § 9605], 42 U.S.C. § 9607(a)(4)(B).

*Lansford–Coaldale Joint Water Authority v. Tonolli Corp.*, 4 F.3d 1209, 1219 (3d Cir. 1993). CERCLA imposes strict liability upon responsible parties. *Alcan*, 964 F.2d at 259.

It is undisputed that the moving plaintiffs have incurred response costs in a clean-up at the Site. Therefore, the third prong of the above-described standard is not at issue in this case. While the consistency of the expended costs with the National Contingency Plan is an issue ultimately to be resolved in this litigation, it is not at issue in Phase I. Therefore, resolution of these motions for summary judgment depends only upon the first two prongs. Thus, plaintiffs must show that: (a) the Site is a CERCLA facility at which there was a release or threatened release of hazardous substances; and (b) each defendant is a covered person responsible for clean-up costs at the Site.

### A. *Release or Threatened Release of Hazardous Substances at the Site*

■ Plaintiffs must prove that the Site is a CERCLA "facility," and that there was a release or threatened release of hazardous substances at the Site. CERCLA defines a "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B); *see also,* 42 U.S.C. § 9601(14) (defining "hazardous substance"); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n. 15 (2d Cir.1985) ("facility" is defined broadly to include any property where a hazardous substance is present). A "release" of hazardous substances at a facility includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers or other closed receptacles containing any substance or pollutant or contaminant)." 42 U.S.C. § 9601(22).

Plaintiffs have presented considerable evidence that hazardous materials were disposed of and found at the Site, and that there

was a release of those hazardous materials. In particular, many opened and deteriorating drums containing hazardous substances were found at the site. *See* U.S. Ex. 3 (Harper Affidavit); U.S. Exh. 1 (RI Report) at § 6.4, Table 7–1 (listing hazardous substances found at the Site); U.S. Exh. 2 (Phase II Drum Removal Close Out Report) at pp. 2–4 through 2–9, Table 1. Blosenski argues that there are "flaws and contradictions" in the evidence presented by the moving parties which create a genuine issue of material fact as to the presence of hazardous materials at the Site. Blosenski also claims that certain documents in the EPA administrative record cast doubt on the contention that hazardous substances were at the Site.[5]

Blosenski's arguments and the evidence he presents establish, at most, that there were certain locations at the Site where no hazardous substances were found, or that there is some uncertainty about the exact level of contamination at the Site. They do not cast doubt on the conclusion that hazardous substances were disposed of and were released at the Site. Therefore, the court finds as a matter of law that the Site is a facility and that there was a release of hazardous substances at the Site. It is undisputed that the moving plaintiffs have incurred response costs in its effort to clean up the Site. Therefore, the only issue possibly remaining for the Phase I trial is whether each Phase I defendant is responsible for those costs as a "covered person" under CERCLA.

### B. Covered Persons

"Covered persons" against whom response costs can be recovered include:

(1) the owner and operator of ... a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... and,

(4) any person who accepts or accepted any hazardous substance for transport to disposal or treatment facilities or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....

42 U.S.C. § 9607(a)(1), (2), (4). Defendants who are described by subsection (1) or (2) are commonly known as "owners" or "operators," while those who are responsible under subsection (4) are known as "transporters."[6]

#### 1. Joseph M. Blosenski, Jr.

Plaintiffs have moved for summary judgment against Joseph M. Blosenski, Jr. ("Blosenski") as to owner/operator and transporter liability. Because the court finds that the undisputed facts require judgment as a matter of law that Blosenski is liable as an owner/operator of the Site and as a transporter of hazardous materials to the Site, plaintiffs' motions will be granted.

#### a. Owner/operator liability

Given the court's finding that the Site is a facility and that there has been a release of hazardous substances at the Site, the uncontested facts compel a finding that Blosenski is liable as an owner/operator of the Site.[7] It is uncontested that Blosenski is the current owner of the Site, and has been an owner of the Site since May 26, 1971. Blosenski also admits that he operated the Site from 1971 until May 3, 1979. *See* Blosenski Mem. at 2 (admitting ownership); Jt. Exhibits 37, 38, 39 (deeds). Because Blosenski is the current owner of the Site, the court finds

---

5. Further argument by Blosenski as to the presence of hazardous substances at the Site is material only to the question of whether Blosenski is liable as a "transporter." *See infra* Section IV(B)(1)(b).

6. Another type of covered person, commonly known as a "generator" is

any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by

any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances.

42 U.S.C. § 9607(a)(3). Generator liability is not at issue in the Phase I trial.

7. Indeed, Blosenski's counsel conceded at oral argument that Blosenski is liable as an owner/operator if the court finds, as it has, that there was a release or threatened release of hazardous substances at the Site.

as a matter of law that he is liable as a current owner under 42 U.S.C. § 9607(a)(1). *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1280 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir. 1988). In addition, as an admitted owner and operator of the Site during the time that hazardous wastes were dumped there, Blosenski is liable as a matter of law under 42 U.S.C. § 9607(a)(2). *See Shore Realty,* 759 F.2d at 1044.

### b. Transporter liability

Plaintiffs argue that Blosenski is also liable as a "transporter." *See* 42 U.S.C. § 9607(a)(4). To establish transporter liability, plaintiffs must show that Blosenski transported hazardous substances to the Site and that the Site was selected by Blosenski. *Id.*

Blosenski admits that between 1971 and May 3, 1979 he "transported certain substances" to the Site. Blosenski Mem. at 2. However, he denies that any of those substances were "hazardous" as defined by CERCLA. Plaintiffs, however, have submitted evidence that Blosenski transported hazardous materials to the Site during this period. Because Blosenski has failed to present evidence which would create a genuine issue of material fact as to his transporter liability, the court finds as a matter of law that Blosenski is liable as a transporter.

The unrebutted evidence submitted by plaintiffs consists of the deposition testimony of a truck driver hired by Blosenski to transport waste to the Site, together with evidence from various generators of hazardous waste as to the types of waste transported by Blosenski to the Site from their plants and factories.

Kenneth R. Hoffman was a truck driver hired by Blosenski to haul wastes from a variety of industrial and commercial customers to the Site. Jt. Exh. 52 at 9–18; Jt. Exh. A at 12. In his deposition, Hoffman testified that Blosenski was his immediate supervisor during the time that he worked for him. Jt. Exh. 52 at 12. Hoffman described the wastes hauled from specific customers and testified that those wastes were transported to the Site and disposed of there at Blosenski's direction. Hoffman provided this information with respect to: The Budd Company, *see* Jt. Exh. 52 at 41–48; Chubb National Foam, *see* Jt. Exh. 52 at 20–25; Diamond Shamrock Chemical Company, *see* Jt. Exh. 52 at 48–54, 58–63, 121, 134–37, 146; The Sartomer Company, *see* Jt. Exh. 52 at 35–41; and other potentially responsible parties, *see* Jt. Exh. 52 at 27–35, 139–143, 146.

Hoffman testified that he transported wastes to the Site, at Blosenski's direction, from the Budd Company's Trailer Division in Eagle, Pennsylvania. These wastes included fifty-five gallon drums with paint in them. He testified that these drums of paint sometimes came open, spilling the contents, when they were dumped at the Site. Evidence produced by Budd during discovery indicates that, at the Budd facility from which Hoffman transported waste, Budd used various paints in fifty-five gallon drums. Material Data Safety Sheets ("MS/DS sheets")[8] provided by Budd indicate that the ingredients of all the paints used by Budd at its Eagle location included xylene, toluene and lead. U.S. Exh. 3 at ¶ 9 (attaching supporting documentation). Xylene, toluene and lead are all hazardous substances as defined by CERCLA. *See* 42 U.S.C. § 9601(14); 40 C.F.R. Part 302.4 (1987).[9]

---

8. MS/DS sheets "are documents generated by the original product manufacturer and provided to the product purchaser describing the hazardous content and nature of the product being sold." U.S. Exh. 3 (Harper Affidavit) at ¶ 8.

9. Hoffman also testified that he transported drums of "what they call Tech-top[,] ... an undercoating that they used to put on the semi-trailers," from Budd's Eagle location to the Site. Jt. Exh. 52 at 41–48. Evidence obtained from Budd during discovery indicates that, at Budd's Eagle facility from which Hoffman transported waste, Budd used a rust preventative known as

"Tectyl," in fifty-five gallon drums. U.S. Exh. 3 at ¶ 9 (attaching supporting documentation). Numerous drums labeled "Tectyl" were recovered at the Site during the clean-up operation. *See* U.S. Exh. 4 (photographs of drums recovered at Site).

Tectyl is a "corrosion preventative coating for trailers, containers and container chassis." MS/DS sheets indicate that there are several different formulations of Tectyl. The MS/DS sheet for the formulation known as Tectyl 151A indicates that it contains 7% xylene by weight. The MS/DS sheets provided by Budd for all of the

Hoffman also testified that he transported wastes to the Site, at Blosenski's direction, from a Chubb National Foam plant in West Chester, Pennsylvania. The material transported to the Site from Chubb included a "brownish black" "cake material" with a "rank" odor that became a "sludge" when it got wet. Jt. Exh. 52 at 20–25. Information submitted to the EPA by Chubb indicates that the waste material generated at its West Chester plant and hauled by Blosenski was a "filter cake" containing phenol at 93.5 parts per million and zinc at 1,903 parts per million. U.S. Exh. 3 at ¶ 9 (attaching supporting documentation). Phenol and zinc are both hazardous substances as defined by CERCLA. *See* 42 U.S.C. § 9601(14); 40 C.F.R. Part 302.4 (1987).

The above-described evidence that Blosenski transported hazardous substances to the Site from Budd's Eagle location and from Chubb's West Chester facility, if believed by the trier of fact, would command judgment as a matter of law that Blosenski is liable as a CERCLA transporter.[10] Thus, if Blosenski is to avoid summary judgment against him as to transporter liability, he must produce evidence to create a genuine issue of material fact as to the hazardous nature of the materials transported by him to the Site from Budd and Chubb. He has failed to produce such evidence. Indeed, the evidence he has produced confirms the evidence presented by plaintiffs.

Blosenski has testified that he reviewed the specific portions of Hoffman's testimony as it related to both Budd and Chubb. Blosenski Exh. 17 at A–90. When asked, "Did you agree with [Hoffman's] testimony? Would you think that was correct?," Blosenski responded, "Within reason, yes." *Id.* Rather than presenting evidence that contradicts Hoffman's testimony, Blosenski's counsel attempts to make much of the fact that Blosenski testified that he only "kind of breezed through" Hoffman's deposition. *See* Memorandum of Blosenski, et al. contra to United States' Motion for Summary Judgment (docketed at # 124 in Civil Action No. 93–1976) at 19–21. Counsel would have the court conclude that Blosenski's expressed agreement with that testimony should therefore be ignored. However, counsel's argument is futile. While Blosenski did testify at one point that he "kind of breezed through" Hoffman's testimony, he later testified that he had specifically reviewed those portions of the testimony regarding Budd and Chubb, *see* Blosenski Exh. 17, precisely the portions of Hoffman's testimony upon which the court relies.

Even if Blosenski had completely failed to read Hoffman's deposition, he could not now overcome the evidence presented in that deposition without presenting affirmative evidence that calls into question the material portions of Hoffman's testimony. He has failed to do so. The specific disagreements with Hoffman's testimony raised by Blosen-

---

other Tectyl formulations it used show that they contain from 25% to 55%, by weight, a "stoddard type" solvent. Stoddard type solvents typically contain toluene, xylene and ethylbenzene in small quantities. Harper Affidavit, U.S. Exh. 3 at ¶ 9 (attaching supporting documentation). All of these ingredients are hazardous as defined by CERCLA. *See* 42 U.S.C. § 9601(14); 40 C.F.R. Part 302.4 (1987).

This evidence regarding Tectyl may provide an independent ground for finding that Blosenski is liable as a transporter, since it seems inescapable that the "Tech-top" referred to by Hoffman is Tectyl. However, because we find that the other evidence establishes transporter liability as a matter of law, the court need not decide if this evidence standing alone would create a burden under Rule 56 for Blosenski to produce evidence rebutting the conclusion that Tectyl and "Tech-top" are one and the same.

10. Hoffman also testified that he transported wastes to the Site, at Blosenski's direction, from a Diamond Shamrock facility in Delaware. These wastes included a brown sludge, a white powder, and pellets. Jt. Exh. 52 at 48–54, 58–63, 121, 134–37, 146. He further testified that he transported wastes, at Blosenski's direction, from a Sartomer facility in West Chester, Pennsylvania to the Site. These wastes included empty or nearly empty chemical bags, sometimes with a white cake or powder, and with an odor. Jt. Exh. 52 at 35–41. Plaintiffs have submitted evidence that purportedly establishes that the waste hauled from these locations was hazardous. Harper Affidavit, U.S. Exh. 3 at ¶ 9 (attaching supporting documentation). In light of our finding that Blosenski is liable as a transporter of hazardous wastes from Budd and Chubb, we need not decide if genuine issues of material fact exist as to the transport of hazardous wastes from other locations.

ski in his deposition are immaterial.[11] Therefore, the court finds that the portions of Hoffman's testimony upon which it has relied are unrebutted.

Similarly, Blosenski has presented no evidence contrary to plaintiffs' evidence that the waste materials described by Hoffman as hauled from Budd and Chubb to the Site contained hazardous materials. Instead, he raises several objections to the adequacy of plaintiffs' proof, all.of which are without merit.

Plaintiffs' evidence that the materials from Budd and Chubb were hazardous is presented in documents attached to an Affidavit of James P. Harper. *See* U.S. Exh. 3. Blosenski complains that Harper was not previously identified as an expert upon which the United States would rely, and avers that Harper's statements are not supported by the submitted evidence.

Blosenski's objections to the Harper Affidavit are without merit. None of the information upon which the court relies depends upon Harper having any specialized knowledge or expertise. Paragraph 9 of Harper's affidavit, which presents the relevant evidence, is simply a compilation and summary of information contained in the supporting documents attached to the affidavit. The court has independently examined these supporting documents and bases its conclusions upon that independent examination.

█ Blosenski repeatedly criticizes plaintiffs' evidence by claiming that it fails to state the level of concentration of hazardous substances in the waste hauled to and present at the Site. In fact, however, the evidence described above as material to Blosenski's transporter liability *does* state concentration levels for the hazardous substances contained in the transported waste. At any rate, the exact concentration levels of hazardous substance are legally irrelevant, since the third

circuit has held that liability for response costs under CERCLA does not depend on the presence of some minimum threshold level of hazardous substance. *Alcan,* 964 F.2d at 259–61.

### 2. Ada Blosenski

Plaintiffs in the *ARCO* action move for summary judgment against Ada Blosenski, Blosenski's wife.[12] Ada Blosenski has cross-moved for summary judgment. Because there are disputed issues of material fact, both motions must be denied.

#### a. Operator liability

█ It is undisputed that Ada Blosenski did not and does not own the Site. Plaintiffs, however, contend that Ada Blosenski is liable because she was an operator of the Site at the time that hazardous waste was deposited there. *See* 42 U.S.C. § 9607(a)(2).

The third circuit has recently discussed the meaning of "operator" under CERCLA:

The definition of "operator" in CERCLA gives little guidance to the courts in determining if a particular person or entity is liable as an operator. The statute circularly defines "operator" as "any person ... operating such facility." 42 U.S.C. § 9601(20)(A)(ii). Several cases have attempted to give substance to liability as an operator and in general have construed "operator" broadly to encompass all who profit from the facility and at the same time have a degree of day-to-day control over the management of the facility. For example, in *United States v. New Castle County,* 727 F.Supp. 854, 869 (D.Del.1989), the district court listed the following factors as being relevant: whether the person or entity controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; was responsible for

---

11. Blosenski testified that some of Hoffman's dates and times "might have been off a little here and there." Blosenski Exh. 17 at A–90. However, he has not argued that any of these time and date discrepancies are in any way material. In addition, Blosenski disputed Hoffman's claim that sludge was transported from Diamond Shamrock to the Site. *Id.* at A–89. While this might create a disputed issue of fact as to the

transport of the sludge, this dispute is not material, since the court finds that the Budd and Chubb evidence is sufficient to establish Blosenski's transporter liability.

12. Ada Blosenski is not a defendant in the *U.S.* action.

the maintenance of environmental control at the facility; and conferred or received any commercial or economic benefit from the facility, other than the payment or receipt of taxes.

*FMC Corp. v. United States Department of Commerce,* 10 F.3d 987, 995 (3d Cir.1993). *See also, New Castle County,* 727 F.Supp. at 869 (when applying the above-described factors, court should look at totality of the circumstances); *Tonolli,* 4 F.3d at 1220–22 (parent corporation is liable as an operator when it has "actual participation and control" over subsidiary's decision making).

The evidence of Ada Blosenski's management and/or control of the Site is mixed. She testified that she was not involved in the Blosenski waste hauling and disposal business until after the Site was closed. Ada Blosenski Exh. 1 at 5–6, Exh. 2 at 5–6. In particular, with respect to the landfill operation, she testified as follows: "I was really involved with raising the children at that time. I had nothing to do with any of the businesses, landfill or anything. I didn't even know that Joe had a landfill back then." Ada Blosenski Exh. 3 at 62. *See also, id.* at 60–61 (testifying that she had no knowledge of landfill's operation).

Plaintiffs, however, have presented evidence to the contrary. An equipment lease to which the Blosenski proprietorship was a party, and which was in existence prior to the Site's closure, lists the lessee as "Joseph Jr. & Ada Blosenski, Jointly & Individually DBA Blosenski Disposal Service." Jt. Exh. 78. Another such lease lists names the lessee as "Joe and Ada Blosenski ind./Blosenski Disposal." Jt. Exh. 77. Both of these leases are apparently signed by Ada Blosenski. Jt. Exh. 78. In their 1980 application to the Central and Western Chester County Industrial Development Authority, the Blosenski's write of "our" trash removal business. The application is signed by Joseph Blosenski on behalf of "Joseph M. Blosenski and Ada C. Blosenski." Jt. Exh. 79. Finally, in a mortgage application submitted by the Blosenskis in 1985, Ada Blosenski stated that she was an office manager in a sanitation business and had been so employed for twenty-four years. Jt. Exh. 76.

The court concludes that there is a genuine issue of material fact as to whether Ada Blosenski was an operator of the Site at the time that hazardous wastes were deposited there. Therefore, the cross-motions for summary judgment will be denied.

#### b. Transporter liability

■ Plaintiffs also argue that Ada Blosenski is liable as a transporter of hazardous wastes to the Site. *See* 42 U.S.C. § 9607(a)(4). The same considerations described above with respect to Ada Blosenski's alleged operator liability are germane to her possible liability as a transporter. In addition, the court must consider the testimony of Kenneth R. Hoffman, a truck driver hired by Blosenski to haul wastes from a variety of industrial and commercial customers to the Site. *See supra* Section IV(B)(1)(b) (discussing Blosenski's transporter liability).

Hoffman testified that Blosenski was his immediate supervisor during the time that he worked for him and that he transported hazardous wastes to the Site at Blosenski's direction. Conflicting inferences may be made from Hoffman's testimony. The court could infer that Blosenski was solely responsible for the choice of the Site as a destination for hazardous materials, which would imply that Ada Blosenski is not liable as a transporter. On the other hand, the court could infer that while Blosenski was solely responsible for directing Hoffman, Ada Blosenski played a role in the day-to-day decision-making that led to Blosenski's orders. Because conflicting inferences can be made from the undisputed facts, the cross-motions for summary judgment as to Ada Blosenski's transporter liability must be denied.

#### c. "Joint Venture" liability

■ Plaintiffs argue that Ada Blosenski is liable as a member of a joint venture with her husband in his trash business. Again, because the role of Ada Blosenski in the Blosenski trash business is disputed, the cross-motions for summary judgment as to Ada Blosenski's joint venture liability must be denied.

### 3. Alexander M. Barry

Plaintiffs have moved for summary judgment against Alexander M. Barry ("Barry"), claiming that he was a co-owner, along with Blosenski, of approximately five acres of the Site at the time hazardous wastes were dumped there. *See* 42 U.S.C. § 9607(a)(2). Barry has cross-moved for summary judgment, arguing that he never owned any part of the property, and that there is no evidence that there was a release or threatened release of hazardous substances on the part of the property he allegedly owned.

The court finds as a matter of law that there was a release or threatened release on the parcel of the Site allegedly owned by Barry. However, because there exists a genuine issue of material fact as to Barry's ownership, the court will deny the cross-motions for summary judgment.

#### a. Release of hazardous wastes on the property allegedly owned by Barry

 Despite Barry's assertion to the contrary, there is no genuine issue of material fact as to the release or threatened release of hazardous wastes on the part of the Site allegedly owned by him. The United States has presented considerable evidence, including maps indicating the precise location of drums excavated at the Site, showing that numerous drums and other containers were recovered on the five acres of the Site allegedly co-owned by Barry. Test data reveal that these drums were properly classified as containing hazardous wastes as defined by CERCLA, 42 U.S.C. § 9601(14). *See* U.S. Exh. 2 (Close Out Report) at § 2 and Appendix C. Because Barry has presented no contrary evidence, the court finds as a matter of law that there was a release or threatened release of hazardous substances on the part of the Site he allegedly owned. Thus, Barry's liability turns on the question of whether he owned the land.

#### b. The meaning of "owner" under CERCLA

 Plaintiffs have presented documentary and testimonial evidence indicating that Barry owned the five-acre parcel in question. It is undisputed that Barry, along with Blo-senski, is named as the grantee on a deed to the relevant part of the Site. No signatures of grantors or grantees appear on the deed, which is dated August 10, 1972, and shows that the property was conveyed for $6,000. *See* Jt. Exh. 39. Blosenski testified that he and Barry bought the property together, and jointly paid to have it surveyed. According to Blosenski, they intended to use the site as a landfill and Barry subsequently lost interest in the land when it was denied a landfill permit. However, Barry never renounced his ownership of the land. Blosenski alone paid taxes on the land. In 1991, Barry executed a deed transferring his interest in the property to Blosenski for one dollar. Blosenski testified that Barry deeded the land to him in 1991 because Barry "figured [Blosenski] should own it" because he had always paid the taxes on it. *See* Jt. Exh. 40 (deed); ARCO's Opposition to Barry's Motion for Summary Judgment, Exhibits A & B (Blosenski depositions). Finally, plaintiffs present answers provided by Barry's attorney in response to a 1991 letter inquiry from EPA. In response to a request to identify "any and all business relationships between yourself [Barry] and Joseph M. Blosenski, Jr.," Jt. Exh. 41, Barry's attorney responded:

> There have been three business relationships between Alexander M. Barry and Joseph M. Blosenski, Jr. ... The third relationship involved a jointly owned property in West Caln Township. Alexander M. Barry and Joseph M. Blosenski purchased that property in 1972 and held onto it until March of 1991 when Alexander M. Barry transferred his interests in the property to Joseph M. Blosenski, Jr.

Jt. Exh. 42 at 2. *See also, id.* at 1 (referring to the five acre parcel that Barry "used to own").

Barry presents evidence to support a different version of the events surrounding the purchase and ownership of the five acres of land. According to Barry's deposition testimony, he and Blosenski discussed buying the five-acre plot together in approximately 1970 or 1971, for use as a woodlot. Barry, however, declined to go ahead with the purchase because he decided he could not afford it. Barry knew that Blosenski bought the land

at approximately that time, but Barry was not involved in the purchase, and did not know that his name went on the deed. It was only in about 1990 or 1991, when Blosenski informed him, that Barry discovered his name was on the deed. Barry was "shocked to hear that." When he discovered that his name was on the deed, Barry quickly moved to correct what he saw as an error by conveying his putative interest in the land to Blosenski. He received no consideration for the transfer. *See* Barry's Motion for Summary Judgment, Exh. B (Barry deposition).[13]

■ If we accept the version of the facts presented by plaintiffs' evidence, Barry is liable as an owner of the landfill, even if he lost interest in the land shortly after the purchase, played no role in the decision to dump waste there, and exercised no control over the land. Mere ownership is enough. *United States v. Monsanto Co.,* 858 F.2d 160, 169 (4th Cir.1988) (owners liable regardless of participation in disposal activities), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *United States v. A & N Cleaners and Launderers,* 788 F.Supp. 1317, 1332 (S.D.N.Y.1992) (mere ownership of property sufficient to impose liability, regardless of any control or lack of control). Indeed, since current owners of a CERCLA facility are liable even if they did not own the site at the time hazardous wastes were deposited there, *see,* 42 U.S.C. § 9607(a)(1), it would be anomalous to conclude that the owner of the site at the time the wastes were deposited is not liable unless he exercised control over the site.

■ Under Barry's version of events, however, the court cannot find that Barry was an owner. If, as Barry suggests, Blosenski put Barry's name on the deed without

Barry's knowledge or consent, Barry continued to be ignorant of the fact that his name was on the deed, and Barry took action to correct what he saw as an error as soon as he found that his name *was* on the deed, it would be inequitable, even under CERCLA's strict liability regime, to hold Barry liable as an owner of the site.

■ The court finds that in order to be an "owner" under CERCLA, Barry must have manifested some intent to own the property. This intent could be evidenced, for example, by a contribution to the purchase price or by an agreement between Blosenski and Barry that they would be joint owners without Barry contributing to the purchase. Barry's intent to own the land could also be evidenced by his knowledge that Blosenski bought the land in both of their names, or that his name appeared on the deed, without taking any action to disavow the apparent joint ownership. In keeping with CERCLA's strict liability, *see Alcan,* 964 F.2d at 259, the intent required is merely an intent *to own,* not an intent that hazardous wastes be deposited on the land, or even an intent that the site be used as a landfill. Barry's control, or even knowledge, of what went on at the site is not relevant to this inquiry. Even if Barry intended that the site be bought as a woodlot, and never checked to see how the land was used, he would be liable if he had intended to own it.

Because the court is presented with evidence to support two different versions of the events surrounding the purchase and ownership of the five acre parcel, and the differences in the two versions are material, the cross motions for summary judgment must

**13.** Plaintiffs argue that Barry's 1991 conveyance to Blosenski, by warranty deed, of his interest in the land serves as an admission that he owned the land up until that time. However, if the conveyance was for one dollar, as the deed indicates, his actions could also be interpreted as a good faith effort to correct a mistaken record. The court does not find the fact that the conveyance was by warranty deed, rather than quitclaim deed, to be determinative, though it may be relevant to the determination of whether Barry owned the land. *See* Summ.Pa.Jur.2d, Property § 9:4 (1992) ("Quitclaim deeds are used

when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title."). Similarly, plaintiffs argue that the response from Barry's attorney to EPA's letter inquiry, *see* Jt. Exhibits 41 & 42, is an admission that Barry owned the land, and that Barry cannot create an issue of fact by introducing his deposition testimony to the contrary. The court finds that, while the letter may be relevant to the credibility of Barry's testimony, it does not estop him from presenting that testimony.

be denied.[14]

### 4. The Blosenski Corporations: Blosenski Disposal Co., Inc.; Blosenski Trucking Corp.; and Suburban Sanitation Corp.

In September of 1981, after the Site was closed, Blosenski registered his waste-hauling business with the Commonwealth under the fictitious name "Blosenski Disposal Service" (hereinafter "BDS"). *See* Jt. Exh. 108 (certificate of registration). In 1985, Blosenski attempted to restructure his waste hauling business by incorporating it under three corporations: Blosenski Disposal Co., Inc. ("BDC"); Blosenski Trucking Corporation ("BTC"); and Suburban Sanitation Corp. ("SSC"). *See* U.S. Exh. 9; Jt. Exh. B at 85, 109 (Blosenski deposition).[15] Plaintiffs in the *ARCO* action have moved for summary judgment against all three of these corporations, while plaintiffs in the *U.S.* action have so moved against only BDC and BTC. Because the United States and the Commonwealth believe that triable issues of fact exist as to SSC's liability, the *ARCO* plaintiffs' motion for summary judgment will be denied as to SSC.

Because BDC and BTC were formed after the Site was closed, and have never owned or operated the Site, it is impossible for them to be directly liable under CERCLA as owners, operators, transporters, or generators. Instead, plaintiffs argue that BDC and BTC are vicariously liable as "alter egos" to Blosenski's sole proprietorship. The court agrees, and finds as a matter of law that the corporate veils of BDC and BTC must be pierced, and that they are liable as Blosenski's alter egos.[16]

### a. Alter ego liability

The third circuit has approved the use of veil-piercing in CERCLA actions. *See Tonolli*, 4 F.3d at 1220 ("Under CERCLA, a corporation may be held liable as an owner for the actions of its subsidiary corporation in situations in which it is determined that piercing the corporate veil is warranted."). As an initial matter, the court must determine whether contours of alter ego liability in the CERCLA context are determined by federal or state law. We hold, as have other district courts in the third circuit, that a uniform federal common law rule of decision is appropriate. *See Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 349–51 (D.N.J.1991); *United States v. Nicolet, Inc.*, 712 F.Supp. 1193, 1201–02 (E.D.Pa.1989). *See also, Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 92 (3d Cir.1988) (in resolving successor liability issues under CERCLA, district court on remand "must consider national uniformity"), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *United States v. Pisani*, 646 F.2d 83, 85–89 (3d Cir.1981) (fashioning federal common law of veil piercing in action to recover Medicare overpayments).

"[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). Because the potential CERCLA liability of a responsible party's alter ego affects the rights of the federal government and falls within the interstices of the statute, the court has authority to develop a federal common law of veil piercing. *See also Smith Land*, 851 F.2d at 91 ("Congress expected

---

**14.** Trial as to Phase I issues was set for February 14, 1994. In order to avoid a delay in the trial, the court announced from the Bench, on February 14, 1994, the findings of this Memorandum and Order. The court further informed the parties that this written memorandum and order would follow as soon as possible. At the trial on February 14, the court found that Barry was an owner under the legal standard described in this Memorandum. *See* Order of February 15, 1994.

**15.** After the assets of BDC, BTC and SSC were sold to EWI in 1987, their names were changed

to, respectively, Blosenski Liquidating Company, Inc., B.T. Liquidating Corporation, and Suburban Liquidating Corp., by articles of amendment filed on February 9, 1987. U.S. Exh. 9.

**16.** Plaintiffs also argue that the Blosenski corporations are liable under federal common law principles of successor liability. Because we find that the Blosenski corporations are liable under a veil piercing theory, we need not decide whether it is appropriate to apply successor liability.

the courts to develop a federal common law to supplement the statute.").

■ The decision that CERCLA alter ego liability is governed by federal law does "not inevitably require resort to *uniform* federal rules. ... Whether to adopt state law or fashion a nationwide federal rule is a matter of judicial policy dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Kimbell Foods,* 440 U.S. at 727–28, 99 S.Ct. at 1458 (internal quotation marks and citations omitted, emphasis supplied); *accord Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943) (federal courts should establish uniform federal rules of decision when a federal statute is silent as to choice of law and overriding federal interests exist); *Pisani,* 646 F.2d at 86. In deciding whether to develop a uniform federal rule, courts must consider: (1) whether national uniformity is needed; (2) whether a federal rule would disrupt commercial relations predicated on state law; and (3) whether application of state law would frustrate specific objectives of the federal statute. *Kimbell Foods,* 440 U.S. at 726–29, 99 S.Ct. at 1457–59.

All of the *Kimbell Foods* factors indicate that a uniform federal veil piercing rule is appropriate in the CERCLA context. As one district court explained:

> In attempting to eliminate the dangers of hazardous wastes, CERCLA presents a national solution to a nationwide problem. One can hardly imagine a federal program more demanding of national uniformity than environmental protection. ... The need for a uniform federal rule is especially great for questions of piercing the corporate veil, since liability under the statute must not depend on the particular state in which a defendant happens to reside.

*In re Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 675 F.Supp. 22, 31 (D.Mass.1987); *accord, Nicolet,* 712 F.Supp. at 1201–02; *Mobay,* 761 F.Supp. at 350.

Application of state veil piercing laws, rather than a uniform federal law, could well frustrate the objectives of CERCLA since, in the absence of a uniform standard, states with laws more protective of parent corporations could serve as safe havens for polluters. As Congressman Florio, the House sponsor of CERCLA, noted, development of a uniform federal common law will "discourage business[es] dealing in hazardous substances from locating primarily in States with more lenient laws." *Mobay,* 761 F.Supp. at 350 (quoting 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980)). *See generally,* Note, *Liability of Parent Corporations for Hazardous Waste Cleanup and Damages,* 99 Harv. L.Rev. 986, 1001–03 (1986). *See also, Smith Land,* 851 F.2d at 92 (use of state law of successor liability could frustrate CERCLA's aims by allowing responsible party to arrange merger or consolidation under the laws of a state with an excessively narrow statute); *Pisani,* 646 F.2d at 87–89 (New Jersey veil piercing, requiring proof of fraud, would frustrate goals of Medicare).

There is no reason to believe that application of a uniform federal law would be disruptive of commercial relationships. As one commentator has pointed out, the principal economic effects of a rule imposing alter ego liability under CERCLA would be to discourage corporations from establishing undercapitalized subsidiaries to engage in hazardous waste disposal and to encourage parent corporations to oversee the hazardous waste disposal activities of their subsidiaries. *Liability of Parent Corporations,* 99 Harv. L.Rev. at 1000. This can hardly be characterized as "disruptive" of commercial relations.

For the above-described reasons, the court joins other district courts in this circuit in concluding that

> the strong federal interest in uniform enforcement of environmental legislation set forth by Congress; the very real risk that the application of state laws would frustrate the objectives of the federal program; and the fact that a federal law would not disrupt commercial relations predicated on state law, warrants the development of a uniform federal rule applicable to alter ego claims under CERCLA.

*Nicolet,* 712 F.Supp. at 1202; *accord Mobay,* 761 F.Supp. at 350.

The third circuit has articulated a uniform federal rule for alter ego liability when, as here, an individual is alleged to be the alter ego of a corporation. *See Pisani,* 646 F.2d at 85–89 (adopting test of *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir.1976)). In *Pisani,* the court of appeals affirmed a district court decision holding a doctor personally liable for Medicare overpayments made to his solely owned corporation. We adopt the *Pisani* veil piercing analysis as the standard to be applied in the instant case.

As the fourth circuit explained in *DeWitt Truck,* in applying the alter ego doctrine, "courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." 540 F.2d at 685. Several factors are relevant in the court's determination of the reality beyond the form:

> First is whether the corporation is grossly undercapitalized for its purposes. Other factors are ... failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Pisani,* 646 F.2d at 88 (quoting *DeWitt Truck,* 540 F.2d at 686–87) (internal quotation marks omitted); *accord Acushnet,* 675 F.Supp. at 33 (adopting similar factors in CERCLA case). In addition, the situation "must present an element of injustice or fundamental unfairness." *Id.* However, the presence of a number of these factors can be sufficient to show such unfairness. *Id.*

Applying the *Pisani* veil piercing test to the undisputed facts of the instant case, the court finds as a matter of law that the BDC and BTC ("the Blosenski Corporations") are liable as Blosenski's alter egos.

Blosenski was president of both BDC and BTC. His wife, Ada Blosenski, was secretary and treasurer of both corporations. Jt. Exhibits 19, 20, 113, 114. The evidence is somewhat inconclusive as to who held stock in the corporations. While BDC's corporation papers show Blosenski as sole shareholder, *see* Jt. Exhibits 59, 60, he testified that he was the largest, but not the sole, shareholder. Jt. Exh. B at 86–87. BTC's corporation papers also show Blosenski as sole shareholder. Jt. Exhibits 112, 114. However, in the "Unanimous Consent of Directors and Shareholders in Lieu of Special Meeting of Board of Directors and Special Meeting of Shareholders," resolving to sell BTC's assets to EWI, Blosenski and Ada Blosenski both signed as shareholders. Jt. Exh. 119. Ada Blosenski has testified that she was not aware that she was a shareholder, Jt. Exh. H at 18, while Blosenski testified that he was unsure if Ada Blosenski held stock in BDC or BTC. Jt. Exh. B at 114. While there appears to be an unresolved issue of fact as to who held stock in BDC and BTC, the court concludes that it is undisputed that Blosenski was either the sole stockholder in both corporations, or was the dominant of two stockholders.

Blosenski testified that the transition from operation as a sole proprietorship to operation under the corporate aegis did not involve any changes in the business. He has repeatedly testified that nothing changed with incorporation, that he remained in charge just as before incorporation, Jt. Exh. B at 87 (Blosenski deposition); U.S. Exh. II, Blosenski 11/30/93 Dep. at 38, 118, and that the transition was just "basically a name change." Jt. Exh. B at 86.[17] BDC and BTC simply began doing the business that Blosenski had done as BDS, the fictitious name, before incorporation. Jt. Exh. B at 109–110. There were the same employees, the same customers and the same or similar business names prior to the incorporation and after the incorporation. Jt. Exh. A at 102.

---

17. *See also* Jt. Exh. 69 (letter from Blosenski's accountant) ("Blosenski Organization has been restructured from a proprietorship form of business to the corporation form of business. The basic ownership and management has not changed.").

Corporate formalities were not observed, and there was failure to distinguish between corporate and individual funds. Corporate books and records were not maintained. Jt. Exh. B at 87. In fact, Blosenski testified that the only corporate formality observed was the payment of corporate taxes. *Id.* Through an "informal arrangement," the corporations paid ongoing debts of the Blosenski proprietorship. U.S. Exh. Vol. II, Phillips Dep. at 290–91 and 345–46. The fact that neither Blosenski or Ada Blosenski was sure if Ada Blosenski was a stockholder is further indication of failure to adhere to, or even recognize, corporate formalities.

Blosenski and his wife comprised all the officers of the corporations. While Ada Blosenski, as Secretary, apparently signed some of the papers involved in selling the corporate assets to EWI, *see* Jt. Exh. 16 (Secretary's Certificate of resolution selling BDC's assets to EWI); Jt. Exh. 17 (same for BTC), she testified that she had no duties as an officer or director, Jt. Exh. H at 18. Thus, the corporations only officer other than Blosenski was essentially non-functioning.

The evidence shows that the corporations were formed with little or no capitalization. Corporate papers indicate that Blosenski was the sole stockholder in BDC and BTC, with stock at one dollar per share, and do not indicate that more than one share was actually purchased. Jt. Exhibits 59, 60, 112, 114. While BDC and BTC used trucks, containers, and other equipment belonging to Blosenski, no assets were transferred from Blosenski to the corporations. Jt. Exh. A at 101–02; U.S. Exh. Vol. II, Packtor Dep. at 106–07; Blosenski Mem. at 5.

When he was asked if he incorporated BDC and BTC in order to limit his personal liability, Blosenski testified: "I don't know if—I don't think that came into question on it. What was the difference? I mean, it was Blosenski regardless." Jt. Exh. B at 86.

The court agrees that "it was Blosenski regardless" of the formal existence of the corporations. It is clear from the undisputed facts that BDC and BTC continued Blosenski's business, using assets that remained Blosenski's, and operating under Blosenski's control. Thus, BDC and BTC were mere shells, acting as "a facade for the operations of the dominant stockholder," Blosenski. *Pisani*, 646 F.2d at 88. We conclude that BDC and BTC are liable as Blosenski's alter egos. To find otherwise would exalt form over reality, *see DeWitt Truck*, 540 F.2d at 685, and would allow the use of the corporate form to frustrate CERCLA's goal of ensuring that those responsible for problems caused by the disposal of hazardous waste bear the cost or remedying the harmful conditions. *See Smith Land*, 851 F.2d at 92.[18]

*b. Defenses raised by BDC, BTC and SSC*

■ BDC, BTC and SSC argue that a CERCLA action cannot be maintained against them because they were dissolved as corporations more than five years prior to the institution of this action, and therefore they lack the capacity to be sued under Pennsylvania law. The court rejects this argument because the undisputed evidence shows that these corporations were never properly dissolved.

Rule 17(b) of the Federal Rules of Civil Procedure provides: "The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." BDC, BTC, and SSC, each of which is a Pennsylvania corporation, claim that they ceased to transact business on or about January 30, 1987, and were dissolved on or about December 31, 1987. They further argue that, under Pennsylvania law, any action against a dissolved corporation must be brought within two years after the date of dissolution. *See* 15 Pa.S.A. § 2111(a) (1967); 15 Pa.C.S.A. § 1979(a) (1993 Pamphlet).[19]

18. The Blosenski Corporations argue that they cannot be held liable as Blosenski's alter egos because they did not exist at the time the Site was operating. Such a restrictive application of alter-ego liability would allow persons who are responsible for pollution to escape liability simply by restructuring at some later time, a result inconsistent with CERCLA's broad remedial scope.

19. Pennsylvania's business corporation law was extensively amended in 1989. In particular, §§ 2101 *et seq.* of the previous law were repealed and replaced by §§ 1971 *et seq.*, effective October 1, 1989. The parties have assumed without dis-

Since these actions were filed more than five years after the date BDC, BTC, and SSC claim they were dissolved, the corporations conclude that they lack the capacity to be sued.

As evidence that they were dissolved, BDC, BTC and SSC each present an "Out of Existence/Withdrawal Affidavit" dated December 22, 1987. *See* Blosenski Corporations' Motion to Dismiss the Complaint in Intervention (docketed at #30 in the *U.S.* action), Exhibits A, B, C. Accompanying certifications of authenticity show that the out of existence affidavits were received by the Pennsylvania Bureau of Corporation Taxes on December 30, 1987. *Id.*[20] However, "[m]erely filing an out of existence affidavit does not dissolve a corporation." *Shechter v. Shechter,* 366 Pa. 30, 40, 76 A.2d 753, 758 (1950). Indeed, each out of existence affidavit states on its face that "[t]he filing of this Affidavit does not affect the status of the Certificate of Incorporation/Authority of this corporation but does permit the Department of State to relinquish the use of the present name of the corporation to another corporation." Instead, there is a detailed statutory scheme for voluntary corporate dissolution. *See* 15 Pa.C.S.A. §§ 2101 *et seq.* (1967); 15 Pa.C.S.A. §§ 1971 *et seq.* (1993 Pamphlet). In particular, articles of dissolution must be filed with the Department of State. *See* 15 Pa.C.S.A. § 2105 (1967); 15 Pa.C.S.A. § 1977 (1993 Pamphlet).

Plaintiffs have submitted affidavits from the Secretary of the Commonwealth stating that each corporation "remains a subsisting corporation with the Department of State. No articles of dissolution have been received or filed with the Department of State." U.S. Exh. 9. BDC, BTC and SSC have not presented any contrary evidence showing that

articles of dissolution were filed. We conclude that, as a matter of law, that BDC, BTC and SSC have not been dissolved under Pennsylvania law, and therefore the two year limitations period for filing suit against a dissolved corporation in Pennsylvania is not applicable.[21]

### 5. Cupola Industrial Centre, Inc.

■ Cupola Industrial Centre, Inc. ("CIC"), a defendant only in the *ARCO* action, has moved for summary judgment. CIC argues that, because it did not exist at the time the Site was in use, it cannot be liable as a responsible party under CERCLA. Therefore, CIC concludes that summary judgment should be granted in its favor. However, the theory of plaintiffs' case against CIC is not that it is liable under CERCLA. Instead, plaintiffs argue that CIC is an indispensable party to this litigation, *see* Fed.R.Civ.P. 19, because it controls assets that are traceable to Blosenski's waste hauling business and must now be made available to help defray the costs of cleanup. Because the court agrees that CIC is an indispensable party to this lawsuit, CIC's motion for summary judgment will be denied.

Plaintiffs have submitted evidence to support the following account of the creation and existence of CIC: Prior to the closure of the Site, Blosenski and Ada Blosenski applied to the Central and Western Chester County Industrial Development Authority ("the Authority") for financing for the "expansion" of their "rubbish removal and recycling business." Jt. Exh. 79. As a result of this application, the Blosenskis were approved for an installment sales agreement with the Authority to purchase the Cupola property, which contained improvements including a garage for which the Blosenskis received

---

cussion that the new version of the law is applicable, in spite of the fact that the attempted dissolution of the corporations occurred prior to the amendments. Fortunately, we need not address this question, since the differences in the old and new versions of the law are not material to our discussion. Instead, we will simply cite to both versions of the statute.

**20.** BDC's and BTC's out of existence affidavits are signed by Blosenski. SSC's is signed by Ada Blosenski.

**21.** Because we find that the corporations still exist under Pennsylvania law, we need not decide whether Pennsylvania's two year statute of limitations for bringing suit against dissolved corporations is preempted by CERCLA. *See Denver v. Adolph Coors Co.,* 813 F.Supp. 1471 (D.Colo.1992) (CERCLA preempts state corporate dissolution laws); Note, *Corporate Life after Death: CERCLA Preemption of State Corporate Dissolution Law,* 88 Mich.L.Rev. 131 (1989).

rent from tenant companies. The Blosenskis built a trash transfer facility on the property and used a portion of the existing garage for repair of containers belonging to BDS, the Blosenski proprietorship. BDS made the monthly payments on the mortgage for the Cupola property, and BDS reduced its tax liabilities by taking the depreciation on the improvements of the Cupola property on its federal tax returns, Jt. Exh. K at 84–86, 97–98. In 1987, the waste hauling assets of Blosenski and the Blosenski corporations, with the exception of the Cupola property, were sold to EWI. Shortly thereafter, the Blosenskis created CIC, Jt. Exh. 89, in which they are each fifty percent shareholders, Exh. 93 (CIC tax returns). They then transferred the Cupola property to CIC, which is the present owner of the property. The Cupola property has been valued at between $1.3 million and approximately $2 million. Jt. Exhibits 95, 118.

Thus, plaintiffs have submitted evidence that, if believed by the trier of fact, would show that the Cupola property was purchased by the Blosenskis with assets acquired from Blosenski's waste hauling business, and that the Blosenskis are still benefiting financially from the property through their joint shareholding in CIC. Because the Cupola property is an identifiable asset of the Blosenski waste hauling and disposal business, plaintiffs are entitled to seek recovery of this asset to help fund the cleanup of the Site. *Denver v. Adolph Coors Co.*, 813 F.Supp. 1471 (D.Colo.1992). This is particularly true in the instant case, where the Cupola property is now under the control of CIC, in which the Blosenskis are the sole shareholders, rather than in the hands of an innocent party. Under such circumstances, to insulate the Cupola property from recovery would frustrate CERCLA's broad remedial goal of insuring that responsible parties bear the costs of clean-up. *See, e.g., Smith Land*, 851 F.2d at 91–92. Since the Cupola property is now owned by CIC, CIC is a necessary party to this lawsuit in order to accord "complete relief" among the parties. Fed.R.Civ.P. 19; *see Adolph Coors*, 813 F.Supp. at 1475 (finding that the entities controlling the assets of the dissolved responsible party should have been before the

court, but not allowing joinder because it "would disrupt all time constraints" in the litigation).

### 6. *Eastern Waste Industries*

■ Plaintiffs argue that EWI is liable as a successor to the transporter business of BDC, BTC SSC (collectively, "the Blosenski corporations") and Blosenski's sole proprietorship, BDS, by virtue of EWI's purchase of all or substantially all of the assets of Blosenski's and his corporations' waste hauling business. *See* Jt. Exh. 11 (asset purchase agreement). The material facts are undisputed, with plaintiffs and EWI differing only in their choice of the proper legal standard to be applied in determining successor liability under CERCLA. Because the court agrees with plaintiffs that application of the "substantial continuity" test, as described by the fourth circuit in *United States v. Carolina Transformer Co.*, 978 F.2d 832 (4th Cir.1992), is appropriate here, plaintiffs' motions for summary judgment will be granted, and EWI's motion will be denied.

### a. *CERCLA successor liability*

■ "The national interest in the uniform enforcement of CERCLA and the same interest in preventing evasion by a responsible party by even legitimate resort to state law" commands that CERCLA successor liability be governed by a uniform federal rule of decision rather than by the laws of the individual states. *Carolina Transformer*, 978 F.2d at 837 (citing, *Louisiana Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1263 (9th Cir.1990); *Smith Land*, 851 F.2d at 92). Therefore, the court must fashion a rule of successor liability which is consistent with the broad remedial aims of CERCLA while still taking into account the traditional concerns of corporate law. *See Smith Land*, 851 F.2d at 91–92.

■ Under traditional and widely recognized rules of successor liability, an asset purchaser is not liable as a successor unless:

(1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3)

the purchasing corporation is merely a continuation of the [seller]; or (4) the transaction is fraudulently entered into to escape liability. . . .

15 Charles R.P. Keating & Gail O'Gradney, *Fletcher Cyclopedia Corporations* § 7122 at 231 (1990 rev. ed.); *accord Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 308–09 (3d Cir.) (reviewing Pennsylvania common law), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985); *Carolina Transformer*, 978 F.2d at 838.

Plaintiffs do not argue that EWI is liable under these traditional principles of successor liability. Instead, they ask the court to adopt a federal rule of decision for CERCLA successor liability that sweeps more broadly than the traditional rules. Specifically, they urge the court to adopt the "substantial continuity" or "continuity of enterprise" principles of successor liability that have been adopted by the fourth circuit court of appeals. *See Carolina Transformer, supra.*

In *Carolina Transformer*, the fourth circuit explained that

we must consider traditional and evolving principles of federal common law, which Congress has left to the courts to supply interstitially. We are reminded that since CERCLA is a remedial statute, its provisions should be construed broadly to avoid frustrating the legislative purpose.

978 F.2d at 837–38 (internal citations and quotation marks omitted). The court then formulated a rule of successor liability based upon "substantial continuity" or "continuity of enterprise" between the successor's and the predecessor's businesses.

Under the fourth circuit's "substantial continuity" approach to CERCLA successor liability, the following factors should be considered in deciding if an asset purchaser acquires the liabilities of the predecessor from which it purchased the assets: (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities and location; (4) production of the same products; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise. *Carolina Transformer*, 978 F.2d at 838; *accord United States v. Distler*, 741 F.Supp. 637, 642–43 (W.D.Ky.1990); *United States v. Western Processing Co.*, 751 F.Supp. 902, 905 (W.D.Wash.1990). *See also United States v. Mexico Feed and Seed Co.*, 980 F.2d 478, 488–90 (8th Cir.1992) (recognizing the exception but finding it inapplicable under the facts of the case); *United States v. Atlas Minerals & Chems.*, 824 F.Supp. 46, 49–50 (E.D.Pa.1993) (same); *City Environmental, Inc. v. United States Chem. Co.*, 814 F.Supp. 624, 635–39 (E.D.Mich.1993) (same); Michael D. Green, *Successors and CERCLA: The Imperfect Analogy to Products Liability and an Alternative Proposal*, 87 Nw.U.L.Rev. 897 (1993) (noting "a modest trend" in the courts favoring the adoption of liberal successor liability for CERCLA actions).[22]

The third circuit has held that the doctrine of successor liability applies to CERCLA. *See Smith Land*. However, it has not decided if or when the substantial continuity test should be applied.[23] The

---

**22.** The "substantial continuity" test shares many features with the traditional *"de facto* merger" exception to the general rule of asset purchaser non-liability. However, the substantial continuity test does away with the *de facto* merger doctrine's requirement that there be "a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation." *Polius v. Clark Equipment Co.*, 802 F.2d 75, 85–86 (3d Cir.1986) (Mansmann, J., dissenting); *see generally*, Alfred R. Light, *"Product Line" and "Continuity of Enterprise" Theories of Corporate Succes-*

*sor Liability Under CERCLA*, 11 Miss.C.L.Rev. 63, at notes 57–73 and accompanying text (1990).

**23.** EWI argues that, in *Smith Land*, the third circuit "has clearly indicated that it is unwilling to expand the law beyond the traditional principles of successor liability." EWI's Motion Brief in Opposition to the Motions for Summary Judgment at 20. EWI bases this claim on language in *Smith Land* remanding the case to the district court for consideration in light of the "traditional concepts" of successor liability. 851 F.2d at 92. EWI, however, has taken this quote out of context and has, we believe, mischaracterized the third circuit's discussion of successor liability in *Smith Land*. In that case, the court of appeals

third circuit has, however, rejected the use of the substantial continuity test in the context of strict products liability, *see* Restatement (Second) of Torts § 402A, finding that it "is an unsound exception to the general rule" that an asset purchaser does not acquire the seller's liabilities. *Polius v. Clark Equipment Co.*, 802 F.2d 75, 75 (3d Cir.1986).[24] The court finds that the concerns that led to the court of appeals' disapproval of the substantial continuity test in products liability cases are not applicable in the CERCLA context. Instead, the substantial continuity test is consistent with CERCLA's broad remedial aims.

The central concern of the *Polius* court was that, even for strict products liability, "the Restatement reaffirms the notion of a causal relationship between the defendant's acts and the plaintiff's injury—a concept that is fundamental to tort law." *Id.*, 802 F.2d at 81. The court rejected the substantial continuity test because it "brush[es] aside this bedrock requirement and impose[s] liability on entities which in fact had no connection with the acts causing injury." *Id.; see also id.*, 802 F.2d at 82 (rejecting the substantial continuity theory "because it proposes an ill-considered extension of liability to an entity

having no causal relationship with the harm").

■■■ This concern with traditional tort principles of causation is not evident in CERCLA. As the second circuit court of appeals has explained, a causation requirement is at odds with the basic structure of CERCLA's definition of responsible parties. 42 U.S.C. § 9607(b) provides several affirmative defenses to CERCLA liability, "each of which carves out from liability an exception based on causation." *Shore Realty*, 759 F.2d at 1044. To incorporate a general causation requirement into CERCLA's liability provisions would thus "construe [the] statute in [a] way that makes some of its provisions surplusage." *Id.* Without a clear congressional command to make such a construction of the statute, the court will not do so. *Id.*

The lack of importance CERCLA places on causation is also evidenced by its legislative history.

Congress specifically rejected including a causation requirement in § 9607(a) [CERCLA's definition of responsible parties]. The early House version imposed liability only upon "any person who caused

---

held that a successor corporation that evolved through a series of statutory mergers and consolidations could be held liable under CERCLA based on its predecessors' acts. The court further stated:

> When no statutory merger or consolidation occurs, but one corporation buys all the assets of another, the successor will not be saddled with the seller's liability except under certain conditions. *See Polius*, 802 F.2d at 77; *Hercules*, 762 F.2d at 308. *The record here indicates that nothing other than statutory mergers or consolidations occurred; therefore the sale of assets or the de facto merger doctrines [footnote omitted] do not appear pertinent.*

*Smith Land*, 851 F.2d at 91 (emphasis supplied). Thus, question of successor liability in the case of an asset purchase, and thus the validity of the substantial continuity approach, was not before the *Smith Land* court. Indeed, in a footnote to the above-quoted passage, at the location indicated in the text, the court notes without comment that the "EPA in a 1984 memorandum of its counsel has taken the position that a successor corporation is liable for the acts of its predecessor under a 'continuity of business operation approach.'" *Smith Land*, 851 F.2d at 91 n. 2 (citing EPA Memorandum, "Liability of Corporate Shareholders and Successor Corporations

for Abandoned Sites under CERCLA," Courtney M. Price, Assistant Admin. for Enforcement and Compliance Monitoring (June 13, 1984)). This "continuity of business operation approach" advocated by the EPA and noted without comment by the court of appeals is precisely the "substantial continuity" test. *See* Finnaren & Halley Exh. X (EPA Memorandum); *see generally* Alfred R. Light, *"Product Line" and "Continuity of Enterprise" Theories of Corporate Successor Liability Under CERCLA*, 11 Miss.C.L.Rev. 63 (1990) (discussing the EPA Memorandum). *See also Distler*, 741 F.Supp. at 641 (*Smith Land*, while holding that the doctrine of successor liability applies to CERCLA, did not reach issue of which version of the doctrine should be applied).

24. The *Polius* court was applying Virgin Islands law. However, Virgin Islands law commands that when there is no governing statute, the courts should examine the common law, first as expressed in the Restatements, and then as generally understood and applied in the United States. Where the Restatement is silent and a split of authority exists, courts should select the "sounder rule." *Id.*, 802 F.2d at 77 (citing *Wells v. Rockefeller*, 728 F.2d 209 (3d Cir.1984)). Thus, the third circuit in *Polius* was expounding what it found to be the "sounder rule" of successor liability.

or contributed to the release or threatened release." ... The compromise version, to which the House later agreed, ... imposed liability on classes of persons without reference to whether they caused or contributed to the release or threat of release. *Shore Realty,* 759 F.2d at 1044 (citations omitted).

 This lack of concern with traditional causation considerations is particularly apparent in CERCLA's landowner liability provisions. For example, under 42 U.S.C. § 9607(a)(1), the owner of a hazardous waste site is liable under CERCLA, even if he did not own the site at the time the hazardous waste was released there. *Artesian Water,* 659 F.Supp. at 1280; *Shore Realty,* 759 F.2d at 1044–45. Similarly, the person who owns a piece of land at the time that hazardous wastes are deposited there is liable for response costs even if she had nothing to do with the dumping and had no knowledge that the wastes were present. *See supra* Section IV(B)(3)(b). Thus, CERCLA liability attaches to the land upon which a CERCLA facility is located, without regard for the landowner's causative role in the creation of the hazard. Given this manifest lack of concern with traditional principles of causation, there is no reason why transporter liability should not also attach to the transporter's assets in appropriate circumstances, even if the purchaser of those assets had no causal connection to the creation of the environmental hazard.

To apply the traditional narrow rules of successor liability in the instant case would "frustrate congressional purpose by exempting from the operation of the Act a large class of persons who are uniquely qualified to assume the burden imposed by it." *United States v. Northeastern Pharmaceutical & Chemical Co.,* 579 F.Supp. 823, 848–49 (W.D.Mo.1984) (quoting *Apex Oil Co. v. United States,* 530 F.2d 1291 (8th Cir.), *cert. denied,* 429 U.S. 827, 97 S.Ct. 84, 50 L.Ed.2d 90 (1976)), *aff'd in part and rev'd in part,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). As the third circuit has stated:

Expenses [of clean-up] can be borne by two sources: the entities which had a specific role in the production or continuation of the hazardous condition, or the taxpayers through federal funds. CERCLA leaves no doubt that Congress intended the burden to fall on the latter only when the responsible parties lacked the wherewithal to meet their obligations.

Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from the use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Smith Land,* 851 F.2d at 92; *accord Distler,* 741 F.Supp. at 641–42. We conclude that CERCLA's broad remedial goals will be served by application of the substantial continuity test to determine successor liability of an asset purchaser.

In the only reported decision in this district discussing the applicability of the substantial continuity test to CERCLA successor liability, Chief Judge Cahn refused to apply the test. *See United States v. Atlas Minerals & Chems.,* 824 F.Supp. 46 (E.D.Pa. 1993) (*Atlas I*); *see also United States v. Atlas Minerals & Chemicals, Inc.,* 1993 WL 482952 (E.D.Pa., Sept. 11, 1993) (*Atlas II*). He found that the cases applying the substantial continuity test did so only under certain special circumstances, such as when the purchaser had knowledge or actual notice that the seller had incurred CERCLA liability, or when there were substantial and continuous ties between the seller and buyer corporations. *See Atlas I* at 50–51 (citing *Polius; Carolina Transformer; Mexico Feed; Asarco; Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 812 F.Supp. 124 (N.D.Ill. 1993); *City Environmental; Distler*); *Atlas II* at *4 & n. 1 (same). Such special circumstances were not present in the case before him.[25]

---

**25.** Chief Judge Cahn also indicated that it might be appropriate to impose the substantial continu-

EWI urges the court to follow Chief Judge Cahn and refuse to apply the substantial continuity test absent proof that EWI had knowledge or actual notice of the Blosenski businesses' potential CERCLA liability. We believe that such a limited application of the substantial continuity test is improper for the same reason that we found *Polius*'s reasoning inapposite: it "suggests that the theory ought to be applied only when there is a causal link between the CERCLA defendant and the environmental harm." *Atlas I* at 51 (citing *Polius*). As we have explained above, CERCLA liability may exist even in the absence of such a "causal link" between the defendant and the environmental harm. However, the debate over the exact contours of when the substantial continuity test should be applied is academic in the instant case, for we find that the undisputed facts show that EWI did have knowledge of the potential CERCLA liability of Blosenski and his corporations.[26]

The Asset Purchase Agreement ("APA") itself provides evidence that EWI was aware of Blosenski's potential CERCLA liability. The APA states, in pertinent part:

No Seller [BDC, SSC and BTC] has been notified by any governmental agency charged with enforcement of environmental laws that such Seller's operations are in violation of any applicable Federal, state or local statute, law or regulation. However, Joseph Blosenski, Jr. and Ada Blosenski have been notified by the [EPA] that [the Site] is on the National Priorities List developed by the EPA and they have received a "Letter of Responsibility" with respect to that property. Blosenski Disposal Service, the proprietorship under which the Shareholders [Joseph Blosenski, Jr., Ada Blosenski, Anthony Blosenski, Joseph Blosenski, III, and Richard Blosenski] operated the business, the assets of which are the subject matter of this Agreement, prior to the formation of the Sellers and the transfer of said business thereto (hereinafter referred to as the "Predecessor Business"), is the subject of several criminal proceedings in which the Commonwealth of Pennsylvania has cited said proprietorship for violations of the Pennsylvania Solid Waste Management Act. The Predecessor Business is also a party in an action before the Pennsylvania Department of Environmental Resources Hearing Board. Joseph Blosenski, Jr. and Ada Blosenski have been named as defendants in lawsuits filed against them by neighbors of the [Site]. Joseph Blosenski,

---

ity test when the "purchasing corporation either in collusion with the seller, or independently, bought only 'clean' assets, and knowingly left 'dirty' assets behind with an insufficient asset pool to cover any potential liability," or when the purchasing corporation's lack of knowledge of the seller's liabilities could be attributed to "willful blindness." *Atlas I* at 50 (quoting *Mexico Feed*, 980 F.2d at 489–90). The court believes that the undisputed facts in this case might support a finding that EWI is subject to the substantial continuity test on either of these grounds. However, we need not resolve this issue.

26. Although we are not inclined to limit the application of the substantial continuity test to occasions when the purchaser has knowledge or actual notice of the seller's CERCLA liability, it may be proper to reserve substantial continuity successor liability for a purchaser who should have known after reasonable investigation of the seller's potential liability. *See Atlas I* at 50 ("Nor is this a case of willful blindness.") (quoting *Mexico Feed*, 980 F.2d at 489–90). This would be consistent with CERCLA's "innocent landowner" defense, which is intended to prevent innocent purchasers of land from being held liable under CERCLA for unknown hazardous dumping or polluting by previous owners. *West-*

*wood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 767 F.Supp. 456, 459 (W.D.N.Y.1991), *aff'd*, 964 F.2d 85 (2d Cir.1992); *accord Fallowfield Development Corp. v. Bryn Mawr Trust Co.*, 1993 WL 157723 at * 7 (E.D.Pa., May 11, 1993). "Innocent," however, does not mean "ignorant." "[L]andowners cannot avail themselves of the innocent landowner defense by closing their eyes to hazardous waste problems." *United States v. Serafini*, 706 F.Supp. 346, 353 (M.D.Pa.1988). Instead, CERCLA imposes an affirmative duty on the purchaser prior to acquisition to inquire "into the previous ownership and uses of the property consistent with commercial or customary practice." 42 U.S.C. § 9601(35)(B). The court is to take into consideration "any specialized knowledge or experience" of the defendant, "the relationship of the purchase price to the value of the property of uncontaminated, commonly known or reasonably ascertainable information about the property or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection." *Id.; accord United States v. Serafini*, 791 F.Supp. 107, 108 (M.D.Pa.1990).

Jr. hereby agrees to indemnify and hold harmless Buyer [EWI] from and against any and all suits, actions, legal or administrative proceedings, claims, demands, losses and costs ... resulting from, arising out of or in any way connected with the above mentioned lawsuits or the business operations of Sellers or the Shareholders (including the Predecessor Business), or any of them, that are asserted by the EPA or the Pennsylvania Department of Environmental Resources to have been in violation of any Federal, state or local statute, law or regulation.

Jt. Exh. 11 at ¶ III.K. This indemnification explicitly anticipates possible CERCLA claims against the Blosenski entities with respect to the Site, and requires Blosenski to indemnify EWI for any losses it incurs as a result of CERCLA liability. EWI's Vice President of Administration, Dennis O'Leary, testified that EWI needed the indemnification in the APA "because of the EPA and the Super Fund laws that ... go after successor companies without regard to whether they had anything to do with causing or creating or being involved with the problem." U.S. Exh. II, O'Leary Dep. at 38. In short, O'Leary admitted that the indemnification was intended to protect EWI against successor liability. *Id. See also,* U.S. Exh. II, Marx Dep. at 50–54 (describing discussion by EWI's board of directors of possible liability associated with the Site).

The APA's indemnification clause does not explicitly mention transporter liability. However, a letter from EPA to Blosenski, dated July 17, 1986, approximately six months before the APA was signed, outlines the potential CERCLA liability of Blosenski and his waste hauling business, including transporter liability. The letter states, in pertinent part:

EPA has information that you and your company (Blosenski Disposal Company) may have transported to and accepted and disposed of hazardous substances at the [Site]. ...

By this letter, EPA notifies you, as the property owner and operator of the [Site] and your company, the Blosenski Disposal

Company (transporter) of your potential liability in regard to this matter. ...

U.S. Exh. 11. Thus, the letter explicitly puts its reader on notice of Blosenski's potential transporter liability.

Plaintiffs argue that this letter is the "Letter of Responsibility" referred to in the APA, and that EWI was therefore aware of the letter's contents. Given the subject of the letter contents, it is clearly *a* letter of responsibility. Because EWI has presented no contrary evidence, the court concludes that it is *the* letter of responsibility referred to in the APA. Thus, EWI had actual notice of Blosenski's transporter liability. Even if this is not the letter referred to in the APA, it was and is a public document available for inspection by the public. Before the APA was signed, the letter was available for public inspection as part of the Blosenski Site File located at EPA Region 3, Philadelphia, Pennsylvania. Given EWI's investigation of the Blosenskis' environmental liability, as evidenced by the APA's indemnification clause, and in the light of EWI's failure to present any evidence that it was unaware of the July 17, 1986 letter from EPA to Blosenski, we find as a matter of law that EWI had notice of Blosenski's potential transporter liability. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (when the moving party has pointed to material facts tending to show there is no genuine issue for trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

As we have stated, EWI has not submitted any affidavit or other evidence denying its knowledge of Blosenski's transporter liability or countering the evidence submitted by plaintiffs. Instead, it asserts in its brief:

While it is possible that EWI was aware at the time of the asset purchase that Joseph M. Blosenski, Jr. and Ada Blosenski had potential liability with regard to the Blosenski Landfill and the proprietorship hauling business, knowledge of these potential liabilities should not warrant the application of the "continuity of enterprise" exception ... [because] EWI purchased assets from the Blosenski Corporations,

which have no independent CERCLA liability with regard to the Blosenski Landfill. Thus, EWI did not have notice or knowledge of the Blosenski Corporations' potential liabilities. EWI's Brief in Opposition to the Motions for Summary Judgment at 42. EWI attempts to distinguish between actual knowledge of Blosenski's potential CERCLA liability, of which it admits it may have known (and as to which the undisputed evidence shows that it did know), and the potential liabilities of the Blosenski Corporations, of which it claims ignorance.

EWI's argument is unpersuasive. First, the undisputed facts show that at the time of purchase most of the purchased assets still belonged to the Blosenski proprietorship, rather than to the Blosenski Corporations. See supra Section IV(B)(4)(a). Although the APA purports to purchase only the assets of the Blosenski Corporations, in fact, the purchased assets belonged to Blosenski at the time of purchase. At bottom, EWI's present argument is an assertion that it was ignorant of the fact that the Blosenski Corporations were, or even could be considered, alter-egos of the Blosenski proprietorship. In evaluating that argument and assertion, the court has considered that EWI is a sophisticated corporation in the business of acquiring and operating waste disposal companies, and was represented by counsel throughout the negotiation process, see EWI's Brief in Opposition to the Motions for Summary Judgment at 4–9 (describing EWI's investigation of the Blosenski business and negotiations between EWI and Blosenski), and can give no credence to EWI's protestations of factual and legal ignorance.

We conclude that EWI knew of Blosenski's potential CERCLA transporter liability at the time that it purchased the assets of Blosenski's waste hauling business. Therefore, it is appropriate to apply the substantial continuity test to determine if EWI is liable as a successor to the Blosenski trash hauling business.

### b. Successor liability of EWI under the substantial continuity test

■ The undisputed facts show that all of the hallmarks of substantial continuity are present in the instant case. The same employees, supervisory personnel and production facilities were in use before and after the sale. The same "product," waste hauling, was produced, using essentially the same assets and with continuity of business operations. The successor business continued to use the Blosenski name and held itself out to the public, through advertising and other means, as a continuation of the previous enterprise. Therefore, we conclude as a matter of law that EWI is liable as a successor to the Blosenski trash hauling business.

### i. Retention of the same employees, supervisory personnel, and production facilities

All Blosenski employees were offered employment with EWI. Jt. Exh. 45 at ¶ 22. This was in keeping with EWI's typical practice of hiring employees of companies that it purchased because those employees were familiar with the business and it was difficult to find suitable replacements. U.S. Exh. II, Speake Dep. at 39; U.S. Exh. II, Vorel Dep. at 88. EWI viewed the ability to hire the Blosenski employees as a valuable asset. U.S. Exh. II, Speake Dep. at 126–27. At the time of the asset purchase, EWI told Blosenski employees that there would not be any changes and that they would receive the same pay and benefits as before the transaction. Id. 197–98. Employee salaries, accumulated sick-leave and vacation time were retained. Employee seniority which accrued before the sale was carried forward to the employee's employment with EWI. Id.; U.S. Exh. II, O'Leary Dep. at 27; Jt. Exh. 45 at ¶ 24.

Most Blosenski employees stayed with EWI after the purchase, and were employed in the same capacity as before the sale as drivers, helpers, shop foremen, clerks, residential sales personnel, managers, and so on. U.S. Exh. II, Speake Dep. at 197–98; U.S. Exh. II, O'Leary Dep. at 15, 47; Jt. Exh. 51; Jt. Exh. N at 73 (Sinclair Dep.). EWI retained the same employees in order to "provide continuity of the business" and to serve the customers that EWI paid "four and a half

million dollars for." U.S. Exh. II, O'Leary Dep. at 15.

EWI recognized the benefit of hiring the management of newly acquired companies because they offered experience in running the operation and knowledge of the geographic area and marketplace. U.S. Exh. II, Marx Dep. at 61; U.S. Exh. II, Downs Dep. at 127. All of the Blosenski management were hired by EWI. U.S. Exh. II, Speake Dep. at 188. Indeed, three-year renewable employment agreements for management were negotiated between EWI and Blosenski as part of the asset purchase agreement. Jt. Exh. 23. Accordingly, Blosenski management became EWI's Honey Brook Division management: Ada Blosenski as Office Administrator; Joseph M. Blosenski, Jr. as Division Manager; Joseph M. Blosenski, III and Anthony Blosenski as Operations Assistants; and Richard Blosenski as Route Supervisor. Jt. Exh. 23. All of these jobs were essentially the same jobs held by the Blosenskis prior to the purchase. U.S. Exh. II, Speake Dep. at 188–89, 199–200.

Joseph M. Blosenski, Jr. continued to run the day-to-day operations of the business in substantially the same manner as he had before the sale. Jt. Exh. B at 87 (Blosenski deposition); U.S. Exh. II, O'Leary Dep. at 44. His duties did not change substantially, except that he needed approval from EWI before granting pay raises or committing to capital acquisitions. U.S. Exh. II, Sinclair Dep. at 68–69; U.S. Exh. II, O'Leary Dep. at 44; Jt. Exh. 43. He continued to hire and fire personnel. U.S. Exh. II, Speake Dep. at 199. For the most part, only administrative support functions, such as payroll, accounting, budget proposals, and new equipment financing were affected by the purchase. Jt. Exh. 43 at ¶ 9.

### ii. Production of the same products, continuity of assets, and continuity of general business operations

Blosenski's "product" was the provision of trash or waste hauling service to a wide variety of residential, commercial, and industrial customers. The primary assets involved in this business were goodwill, customer lists, customer contracts and routes, and the

trucks and containers used to serve those customers. It is undisputed that all of these assets, with the exception of one pick-up truck, were transferred to EWI. Jt. Exhibits 11, 12.

EWI had not operated a trash hauling business in Pennsylvania before it purchased the Blosenski assets. U.S. Exh. II, Speake Dep. at 73–74; U.S. Exh. II, O'Leary Dep. at 50–51. EWI purchased the Blosenski customer list and continued to serve Blosenski's 20,000 to 25,000 customers without major changes. U.S. Exh. II, Speake Dep. at 144, 198; Jt. Exh. 45 at ¶ 41; U.S. Exh. II, Sinclair Dep. at 22–23; U.S. Exh. II, O'Leary Dep. at 9–11, 42.

In addition to the customer lists, EWI purchased the contractual rights to the routes used by Blosenski. U.S. Exh. II, Speake Dep. at 129. This purchase, along with the purchase of the Blosenski company names, was intended to ensure that the continuity of the business was not disrupted as a result in the asset transfer. U.S. Exh. II, Speake Dep. at 128–29. After the sale, EWI continued to service routes that were previously serviced by the Blosenski companies. U.S. Exh. II, Blosenski 1/9/90 Dep. at 93; U.S. Exh. II, Sinclair Dep. at 32–34.

There was continuity of operational facilities before and after the sale. Under the terms of leases executed as part of the asset purchase agreement, EWI initially continued to operate from the same Lippitt Road facilities utilized by Blosenski before the purchase. Jt. Exhibits 11, 24; Jt. Exh. Q at 54–55 (O'Leary Dep.); U.S. Exh. II, Vorel Dep. at 178–79; U.S. Exh. II, Sinclair Dep. at 81. After three months had passed, EWI moved its operations to the space leased under the terms of the Agreement, approximately one-half mile from the old facility. Jt. Exhibits 11, 24; U.S. Exh. II, Speake Dep. at 195–96. However, the new location was in a facility to which Blosenski had planned, long before the sale, to move his operations. U.S. Exh. II, Blosenski 6/3/92 Dep. at 49–51, 92.

In a letter dated July 6, 1987, Blosenski, through counsel, represented to the EPA that the confidentiality claim asserted by Blosenski Disposal Company concerning cer-

tain documents submitted to EPA remained unchanged after the sale because "the *only* change that occurred was that of legal ownership. The operations of Blosenski Disposal Company have continued and will continue as before...." Jt. Exh. 48 (emphasis in original).

### iii. Retention of the same name and holding itself out as the continuation of the previous enterprise

Under the terms of the Agreement, EWI purchased the right to continue to use the Blosenski corporate names. Jt. Exhibits 11, 20; U.S. Exh. II, Speake Dep. at 128. These names were displayed on the trucks and containers purchased by EWI and used by EWI without change after the purchase, in part to maintain customer continuity. Jt. Exh. 45 at ¶¶ 14–19; U.S. Exh. II, Marx Dep. at 85–86. Gradually, as new trucks were purchased by EWI, the names on the trucks were changed. Jt. Exh. 45 at ¶¶ 14–19; U.S. Exh. II, Speake Dep. at 136. To date, however, containers bearing only the Blosenski name remain in use by EWI. Jt. Exh. 73.

EWI continued to use the Blosenski and Suburban Sanitation names without any pre-sale or immediate post-sale customer notification of the sale. U.S. Exh. II, Sinclair Dep. at 21–22; U.S. Exh. II, Vorel Dep. at 180–81; U.S. Exh. II, O'Leary Dep. at 25, 48. EWI sought to service the customers without their knowledge of the sale and to inform them of the sale only after EWI had established continuity of service. U.S. Exh. II, Vorel Dep. at 180. EWI and Blosenski declined to give public notice of the asset sale and the subsequent dissolution (or attempted dissolution, *see supra* Section IV(B)(4)(b)) of the Blosenski companies. U.S. Exh. II, Packtor Dep. at 92–97; U.S. Exh. II, Vorel Dep. at 235–37. Only those creditors whose claims were directly involved in the purchase—leasing companies and regular trade creditors—were given such notice. No notice of the change was given to EPA. U.S. Exh. II, Vorel Dep. at 236.

Consistent with this effort, EWI held itself out to its customers as still being the Blosenski companies. After the purchase, invoices bearing the name Blosenski Disposal Company, Inc., without any mention of EWI, were sent to customers as late as January 1988. Jt. Exh. 70. Similarly, letterhead with only the names of Suburban Sanitation Corp., Blosenski Disposal Company, Inc., and Blosenski Trucking Corp. of PA were used up until November 1987, June 1987, and July 1987, respectively. Jt. Exh. 71.

After the sale, EWI continued to advertise to the general public in the Bell Telephone of Pennsylvania yellow pages under the corporate names of Blosenski Disposal Company and Suburban Sanitation, again with no indication that the Blosenski businesses were now operated by EWI. EWI's name did not appear in the yellow pages advertisement until 1989. Jt. Exh. 36. The yellow pages advertisements proclaim that Blosenski has provided "over four generations of reliable service," a clear indication that EWI held itself out as a continuation of the Blosenski enterprise. *Id.* EWI purchased the right to use the five Blosenski company telephone numbers and used one or more of those numbers after the purchase. Jt. Exh. 45 at ¶ 38. During the first six to eight months after the asset purchase, EWI's office telephone was answered by stating "Blosenski Disposal" or "Blosenski," without any mention of EWI. U.S. Exh. II, Speake Dep. at 191–92; U.S. Exh. II, O'Leary Dep. at 25.

Even in more formal documents, EWI held itself out as a continuation of the Blosenski business. EWI's contracts and contract proposals listed only the names Suburban Sanitation Corp. and Blosenski Disposal Company through January 1988 and July 1988, respectively. EWI used the name Blosenski Disposal Service, the Blosenski proprietorship, as late as March 1987. Jt. Exh. 72.

In addition to holding itself out as a continuation of the Blosenski trash hauling business, EWI held itself out as having purchased the Blosenski companies, without any qualification or indication that the purchase was limited to assets. In a letter dated March 20, 1987, Jack Speake, then President of EWI, stated to the executive director of the Chester County Solid Waste Authority that EWI had "purchased Blosenski Trucking, Blosenski Disposal and Suburban Sanita-

tion" without any qualification or indication that the purchase was limited to assets. Jt. Exh. 47. In a letter from EWI to its vendors and suppliers, sent out well over one year after the purchase, EWI wrote:

Effective February 1, 1987, our company's name was changed from Blosenski Trucking/Disposal to Eastern Waste Industries. Please be sure to change your records. Many of our vendors are still sending invoices to Blosenski Trucking or Disposal, and the local post office is forwarding these to the former owner of our company.

United States Supplement to Motion for Summary Judgment (docketed at #125 in *U.S.* action). This letter reinforces the impression that EWI purchased the Blosenski companies and carried on their business with nothing but a name change.

■ The above-described undisputed facts establish that EWI is liable, under the substantial continuity test, as a successor to the Blosenski waste hauling business. EWI does not challenge the accuracy of the above-described information. Instead, it argues that if there was a "continuity of enterprise," it was limited to the relationship between the Blosenski business and the Honey Brook *Division* of EWI rather than EWI as a whole. Because the Honey Brook Division of EWI is only a small part of EWI's overall operations, EWI argues that there could not be a continuity of enterprise between it and Blosenski.

■ EWI's argument is unpersuasive. Honey Brook Division is EWI. A division of a corporation does not have a separate legal existence from the corporation itself. Equity demands that large corporations not be insulated from CERCLA successor liability in situations where their recently acquired small corporations are liable. EWI's argument bears no relationship to either the remedial goals of CERCLA or to traditional principles of corporate law. For example, if a large corporation created a wholly owned subsidiary to acquire the assets and continue the enterprise of a CERCLA responsible party, the subsidiary would be liable as a successor and the parent would be liable as an alter-ego of the subsidiary if it sufficiently controlled the operations of the subsidiary. At the same time, under the rule proposed

by EWI, if a corporation continued the enterprise of a CERCLA responsible party through a division, and thus *directly* controlled the continued enterprise, without even the fictional intervention of another corporate body, it would be immune from liability.

■ We are not presented here with a situation where a large corporation purchased the assets of a smaller one and then distributed those assets among its various divisions. Instead, EWI purchased the Blosenski assets and continued without substantial interruption the Blosenski enterprise. A large corporation is liable for the CERCLA violations of each of its divisions, and must be liable as a successor if one of its divisions maintains a continuity of enterprise after an asset purchase from a CERCLA responsible party.

In a related argument, EWI contends that there was no continuity of enterprise because after the sale Blosenski was no longer the ultimate boss of the waste hauling enterprise, but instead was divisional manager of the Honey Brook Division, and therefore, like all divisional managers, was subject to EWI's oversight and ultimate control. In keeping with this, EWI instituted certain changes in information reporting and accounting practices, and attained ultimate control over certain important decisions, such as capital acquisition, equipment purchases and leases, and advertising. *See* EWI's Brief in Opposition to Plaintiffs' Motions for Summary Judgment (docketed at #243 in *ARCO*) at 55–60.

The sort of control exercised by EWI over the former Blosenski enterprise is nothing but the sort of control one would expect of a corporation over one of its divisions. Thus, EWI's argument reduces to a repetition of the claim that a large corporation should never be held liable as a successor when it purchases the assets of a CERCLA responsible party and one of its divisions continues the seller's enterprise. The undisputed facts show that EWI exercised its control over the former Blosenski enterprise to continue that enterprise with little or no change in any of the factors delineated by the substantial continuity test. Therefore, it is liable as a successor to the Blosenski waste hauling business.

## V. CONCLUSION

From the undisputed facts, the court finds as a matter of law that Blosenski is liable as an owner of the Site, as a former owner and operator of the Site and as a transporter of hazardous materials to the Site. The Blosenski Corporations, BDC and BTC are liable as Blosenski's alter-egos.[27] The court further finds that the there was a release or threatened release on the part of the Site allegedly co-owned by defendant Barry. However, a genuine issue of fact exists as to Barry's ownership of the land. Genuine issues of material fact exist as to the liability of Ada Blosenski and SSC. Finally, EWI is liable under CERCLA as a successor to Blosenski and the Blosenski Corporations, BDC, BTC and SSC.[28]

An appropriate order follows.

## ORDER

AND NOW, this 2nd day of March, 1994, upon consideration of the briefs and arguments of the parties, it is hereby ORDERED that:

1. The motion of Cupola Trucking Corp., et al. for partial summary judgment (docketed at #201 in C.A. No. 92–2059) is DENIED.

2. The motion of Eastern Waste Industries for summary judgment (docketed at #202 in C.A. No. 92–2059) is DENIED.

3. The motions of Finnaren & Haley, et al. for summary judgment of CERCLA successor liability against Eastern Waste Industries (docketed at #205 and #211 in C.A. No. 92–2059) are GRANTED.

4. The motions of Finnaren & Haley, et al. for summary judgment of HSCA successor liability against Eastern Waste Industries (docketed at #206 and #212 in C.A. No. 92–2059) are DENIED.

5. The motion of Cupola Industrial, et al. for summary judgment (docketed at #208 in C.A. No. 92–2059) is DENIED.

6. The motions of The Valspar Corp., et al. for summary judgment against Joseph M. Blosenski, Jr., Ada Blosenski, The Blosenski Companies, Alex Barry, and Eastern Waste Industries (docketed at #209 and #214 in C.A. No. 92–2059) are GRANTED IN PART AND DENIED IN PART.

7. The motion of Alexander Barry for summary judgment (docketed at #215 in C.A. No. 92–2059) is DENIED.

8. The motion of Suburban Liquidating, et al. to dismiss the Commonwealth's Complaint in Intervention (docketed at #30 in C.A. 93–1976) is DENIED.

9. The motion of the United States for summary judgment (docketed at #120 in C.A. 93–1976) is GRANTED IN PART AND DENIED IN PART.

10. The motion of the Commonwealth of Pennsylvania for summary judgment (docketed at #121 in C.A. 93–1976) is GRANTED IN PART AND DENIED IN PART.

11. Judgment is entered as to Phase I liability in favor of all moving plaintiffs and against Joseph M. Blosenski, Jr.

12. Judgment is entered as to Phase I liability in favor of all moving plaintiffs and against Blosenski Disposal Company, Inc.

13. Judgment is entered as to Phase I liability in favor of all moving plaintiffs and against Blosenski Trucking Corporation.

14. Judgment is entered as to Phase I liability in favor of all moving plaintiffs and against Eastern Waste Industries, Inc.

---

27. Blosenski and Blosenski entities and corporations raise a number of affirmative defenses that have not been addressed in the body of this opinion, including waiver, estoppel and laches. They also argue that retroactive application of CERCLA is unconstitutional. The court rejects all of these arguments.

28. Finnaren & Haley, et al. have also moved for summary judgment as to EWI's successor liability under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 P.S. § 6020.101 *et seq.* The movants have not indicated that any relief would be available to them under HSCA that is not already available under CERCLA. Because the court does not believe that the Pennsylvania Supreme Court would adopt movants' proposed theory of successor liability as the law of the Commonwealth, the motion will be denied.